AUSA: Robert S. Ruff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**25 MAG 3320**

UNITED STATES OF AMERICA

v.

BRANDON A. MURPHY,

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 111(a)(1) and 2231(a)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

Leyna L. Rivera-Zavala, being duly sworn, deposes and says that she is a Special Agent with Homeland Security Investigations ("HSI"), and charges as follows:

## COUNT ONE
### (Assaulting an Officer of the United States)

1. On or about July 24, 2025, in the Southern District of New York and elsewhere, BRANDON A. MURPHY, the defendant, knowingly and forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with a person designated in Title 18, United States Code, Section 1114, while engaged in and on account of the performance of official duties, and in doing so, made physical contact with the victim of the assault, to wit, while a Special Agent of Homeland Security Investigations ("Agent-1") was executing a search warrant at an apartment building in New York, New York, MURPHY shoved Agent-1 and thereafter forcibly resisted arrest by Agent-1 and other officers.

(Title 18, United States Code, Section 111(a)(1).)

## COUNT TWO
### (Forcibly Impeding an Official Search)

2. On or about July 24, 2025, in the Southern District of New York and elsewhere, BRANDON A. MURPHY, the defendant, knowingly and forcibly assaulted, resisted, opposed, prevented, impeded, intimidated, and interfered with a person authorized to serve and execute search warrants and to make searches and seizures, while that person was engaged in the performance of his duties with regard thereto and on account of that person's performance of such duties, to wit, while Agent-1 was executing a search warrant at an apartment building in New York, New York, MURPHY shoved Agent-1 and thereafter forcibly resisted arrest by Agent-1 and other officers.

(Title 18, United States Code, Section 2231(a).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.      I have been a Special Agent with HSI for approximately three years. For approximately two years, I have been assigned to El Dorado Task Force, Transnational Criminal Enterprise Investigations, in HSI's New York Field Office. Within this group, I have led numerous narcotics trafficking based investigations, and in the course of those investigations participated in the execution of search warrants, detainments, arrests, and extraditions. I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, on my conversations with witnesses and other law enforcement officials, and on my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4.      Based on my discussions with and interviews of members of law enforcement, I learned the following, in substance and in part:

   a.  On or about Thursday, July 24, 2025, at approximately 2:00 p.m., members of HSI and the Drug Enforcement Administration ("DEA") were executing a search warrant related to a narcotics trafficking investigation at a certain apartment (the "Apartment") within a certain building (the "Building") located in New York, New York. The Apartment was on the 13th floor of the Building, accessible by elevator.

   b.  While the execution of that search warrant was underway, and while subjects of the investigation who had been in the Apartment were being detained in the hallway outside the Apartment, a group of apparent protesters arrived outside the Building.

   c.  On a particular Instagram account, members of law enforcement observed two July 24, 2025 posts. The first post urged followers to respond to a location where another search warrant was being conducted that day. The first post was also posted to a second Instagram account, the name of which appeared to refer to U.S. Immigration and Customs Enforcement ("ICE"). The second post stated that law enforcement claimed to be doing a criminal investigation at that first location and "came out with DEA evidence boxes." The second post urged followers to respond to a second location, specifically, the intersection where the Building is located. Thus, it appeared that the protesters had come to the Building under the mistaken impression that the execution of the search warrant was part of an immigration enforcement operation.

   d.  On the same date, on or about July 24, 2025, at approximately 5:00 p.m., protesters entered the lobby of the Building. This occurred while HSI and DEA were completing their search of the Apartment and moving evidence, including drug evidence, to vehicles to be transported off premises. Subjects of the narcotics trafficking investigation were also being detained in the hallway outside the Apartment. The fact that protesters had entered the lobby was communicated to law enforcement personnel on scene by radio.

   e.  Among the protesters who entered the building was an individual later identified as BRANDON A. MURPHY, the defendant, a male who was approximately 25 years old, approximately 6'3" tall, and weighing approximately 200 pounds. MURPHY was wearing a hoodie, facemask, and backpack. He was accompanied by an unidentified female associate

("Female-1"). MURPHY and Female-1 are depicted below entering the Building in a still image from the Building's security footage:



f. Three agents who had been transporting drug evidence from the Apartment to vehicles for transportation off premises encountered MURPHY and Female-1 in the lobby of the Building. MURPHY had a cellphone in his hand and appeared to be videorecording the agents. MURPHY continued videorecording throughout the events described herein; at times he appeared to attempt to get closeup recordings of agents' faces.

g. Below are still images taken from the Building's security footage showing MURPHY—wearing a black hoodie, mask, and backpack—and Female-1 following agents into a hallway adjacent to the Building's lobby that leads to the Building's garage, where agents were loading evidence into a vehicle to be transported off premises. The agents, who were wearing clearly marked clothing indicating that they were law enforcement agents, were carrying clear ziplock bags with red seals, which, based on my training, experience, and participation in the investigation, I recognize to be bags in which evidence seized during the execution of the search warrant was stored. MURPHY and Female-1 appeared to begin recording the agents as they came and went from the garage, while transporting evidence:

3



h. Below are still images taken from the Building's security footage showing MURPHY and Female-1 entering the Building's garage and then following agents back out of the garage into the lobby of the Building, as MURPHY appeared to continue videorecording the agents:



 

i. The agents who encountered MURPHY and Female-1 in the lobby advised them that there was an ongoing criminal investigation in the building and that they could not be there. MURPHY and Female-1 responded, in sum and substance, that the building was public property and that they had a right to be present.

j. MURPHY and Female-1 followed the three agents in the lobby to the elevator. MURPHY attempted to enter the elevator with the agents and was told to take the next elevator, but MURPHY insisted on taking the elevator with the agents and prevented the elevator door from closing. To avoid further confrontation, and not knowing whether MURPHY was a resident or had other authorization to be in the building, the agents ultimately allowed him into the elevator car. Female-1 remained in the lobby for the time being. In the elevator, MURPHY continued videorecording the agents using his cellphone. This sequence of events is depicted in part below, in still images taken from the Building's security footage:

 

5




k.    The three agents exited the elevator on the 13th floor of the Building, where the execution of the search warrant was taking place, and MURPHY, still videorecording, followed the agents off the elevator, as depicted below in a still image taken from the Building's security footage. Law enforcement personnel on scene were advised by radio that a protester was on the floor where the search warrant was being executed.



l.    Once on that floor, MURPHY followed the agents down the hallway toward the Apartment where the search warrant was being conducted and where approximately three

detainees from the criminal investigation were being held in the hallway. MURPHY continued videorecording with his cellphone throughout this time.

    m. Shortly after MURPHY arrived on the floor where the search warrant was being executed, Agent-1, who had been conducting the search warrant within the Apartment, exited the Apartment to address MURPHY. Agent-1 has approximately 25 years of experience in law enforcement.

    n. Agent-1 encountered MURPHY, who was still videorecording, in the hallway. Agent-1 instructed MURPHY to stop recording and to leave the 13th floor, where the search was still being executed. MURPHY responded, in substance and in part, that he had a right to be there because it was public property. Agent-1 further advised MURPHY that the operation had nothing to do with immigration, that it was an active criminal search warrant, and that MURPHY was interfering with that investigation. Agent-1 instructed MURPHY that if he was not a resident and not with the owner of the building, he needed to leave.

    o. In response to Agent-1's instructions, MURPHY did not move to leave, and he continued recording with his cellphone, including in the direction of the detainees who were being held in the hallway. Accordingly, Agent-1 closed the distance between himself and MURPHY and attempted to take MURPHY's cellphone from him.

    p. Based on my interview with Agent-1, when Agent-1 reached for MURPHY's cellphone, MURPHY shoved Agent-1 with his free hand. From my interviews of others who were present, it appears that, at the moment of the push, only three other law enforcement personnel were in the hallway (two of the agents with whom MURPHY had ridden the elevator, and a third person, a task force officer). The two agents from the elevator had their backs to MURPHY because they were watching the detainees and attempting to avoid MURPHY's efforts to videorecord their faces. The task force officer's attention likewise was occupied by the detainees. Accordingly, only Agent-1 and MURPHY witnessed the initial physical contact.

    q. Immediately after MURPHY shoved Agent-1, Agent-1 and MURPHY engaged in a physical altercation. Agent-1 pushed MURPHY against a wall intending to apply handcuffs. Agent-1 intended to cuff MURPHY standing but was unable to do so due to MURPHY's resistance.

    r. The agents and task force officer in the hallway quickly turned and saw the physical struggle, and other law enforcement personnel quickly exited the Apartment into the hallway to assist. These witnesses generally described seeing MURPHY's hands on Agent-1 or seeing MURPHY's arms over Agent-1's shoulders, and seeing Agent-1 struggling to get MURPHY under control.

    s. Below are still images taken from the Building's security footage, outside the Apartment where the search warrant was being executed, showing various investigators running out of the Apartment to assist Agent-1, while a detained person (bottom right of the images) sat outside the Apartment:

7



t.  Other law enforcement personnel quickly assisted Agent-1 while MURPHY continued to struggle. MURPHY was not throwing punches or strikes, but witnesses described him as thrashing, stiffening up, balling up, and otherwise forcefully resisting arrest despite commands from law enforcement personnel to stop resisting.

u.  Ultimately, several members of law enforcement, including Agent-1, were involved in the physical struggle with MURPHY. After approximately a minute or two of fighting, MURPHY was ultimately handcuffed.

v.  After MURPHY was restrained, law enforcement personnel seized his cellphone. Once restrained, MURPHY claimed that he did not do anything and that he wanted his cellphone back.

w.  Female-1 then arrived on the floor from the elevator. She appeared to be texting and/or filming. She demanded to know why MURPHY had been arrested.

x.  As a result of the events set forth above, MURPHY was arrested. He was ultimately released that evening without charges, pending further investigation into his conduct.

y.  During my interview with Agent-1, Agent-1 advised that, during the physical confrontation with MURPHY, Agent-1 suffered a minor scrape to his hand and a more serious shoulder injury, for which Agent-1 saw a doctor and has been doing physical therapy. Agent-1 described MURPHY as physically the most difficult person Agent-1 has had to arrest in 25 years in law enforcement due to MURPHY's size, strength, and efforts to resist.

5.  A cellphone seized from BRANDON A. MURPHY, the defendant, during his arrest, was searched with court authorization. Based on my discussions with the forensic analyst who examined MURPHY's cellphone, only limited data was retrievable from the cellphone due apparently to the locked state of the cellphone. No video from the 13th floor was recovered.

However, investigators were able to recover a videorecording, from which the still image below was taken. Based on my review of the video and security footage from the Building, my knowledge of the Building's layout, and my discussions with law enforcement officers, the video was taken by MURPHY and shows agents carrying bags of evidence to a vehicle in the Building's garage to be transported off premises:



WHEREFORE, I respectfully request that a warrant be issued for the arrest of BRANDON A. MURPHY, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

s/ Leyna L. Rivera-Zavala /otw
Leyna L. Rivera-Zavala
Special Agent
Homeland Security Investigations

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), on October 17 , 2025.

THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

9